## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| In re Chardon, LLC, *et. al[1]*,<br><br>  Debtors. | Bankruptcy No. 13-B-81372<br>  (Jointly Administered)<br>Chapter 11<br>Judge Lynch |

### MEMORANDUM DECISION

Before the court are the motions for relief from stay filed by FirstMerit Bank, N.A. ("FirstMerit") in the bankruptcy cases of David Wolf (No. 13-B-83572, ECF No. 43) and Donald Wolf, Jr. (No. 13-B-83571, ECF No. 45) (together, the "Motions for Relief").

For the reasons discussed herein, the Motions for Relief are denied.

### JURISDICTION AND PROCEDURE

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This matter adjudicates a motion for relief from the automatic stay and is a core proceeding arising under title 11 in which the bankruptcy court is authorized to enter final orders. 28 U.S.C. § 157(b)(2)(G). *In re Woods*, 13-B-39194, 2014 Bankr. LEXIS 3507 (Bankr. N.D. Ill. 2014).

---

[1]  Pursuant to the administrative order entered on July 2, 2014, the bankruptcy cases of Donald Wolf, Jr. (No. 13-B-83571), David Wolf (No. 13-B-83572) and Donald Wolf, Sr. (No. 14-B-81919) were procedurally consolidated for joint administration with the eight corporate bankruptcy cases previously procedurally consolidated for joint administration into the lead case of Chardon, LLC (13-B-81372). This memorandum decision relates to and resolves the motion for relief from stay originally filed by FirstMerit Bank, N.A. in the bankruptcy case of David Wolf (No. 13-B-83572, ECF No. 43) and the motion for relief from stay filed in the bankruptcy case of Donald Wolf, Jr. (No. 13-B-83571, ECF No. 45).

## FACTS AND PROCEDURAL BACKGROUND[2]

FirstMerit seeks relief from the automatic stay to continue a prepetition foreclosure action against real estate commonly known as 10611 – 10685 Wolf Dr., Huntley, IL ("10611 Wolf Dr."). 10611 Wolf Dr. is held in a land trust under a December 14, 1999 Trust Agreement (Trust No. 13306), with First Midwest Bank as successor trustee. Donald Wolf, Jr. holds a 24.5% beneficial interest in the trust, David Wolf holds a 24.5% beneficial interest and the Donald L. Wolf, Sr. Family Wolf Declaration of Trust dated 3/26/94 is a 51% beneficial interest holder (See Trial Tr. Day 1 68:7-24, Feb. 25, 2014.)

Debtors David and Donald Wolf, Jr. (the "Wolf brothers" or the "Debtors") and their father Donald Wolf, Sr. (collectively the "Wolf Individuals") are indirect or direct owners and officers of eight entities that each filed Chapter 11 bankruptcy petitions with this court on April 17, 2013: Chardon, LLC (No. 13-B-81372), Chardon II, LLC (No. 13-B-81373), Intervest, LLC (No. 13-B-81374), The Rink of Crystal Lake, Inc. (No. 13-B-81375), Wolf Business Center, Inc. (No. 13-B-81376), Wolf Family Partnership, LLC (No. 13-B-81377), Wolf Investments, Inc. (No. 13-B-81378) and Wolf Professional Center Corporation (No. 13-B-81379) (collectively the "Chardon Debtors"). The various cases of the Chardon Debtors were consolidated for procedural purposes only and joint administration with the Chardon, LLC case as lead case by order entered on May 9, 2013.

The Chardon Debtors own and manage several commercial real estate properties. Eight of these properties, together with the 10610 Wolf Dr. Property, secure certain indebtedness to FirstMerit (collectively the "FirstMerit Collateral Properties"). The Chardon Debtors also own five other properties that secure certain debts to ColFin BAMO II Funding A, LLC ("Colfin")

---

[2] To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

and four other properties that secure certain debts to Old Second Bank ("Old Second"). According to FirstMerit's original proofs of claim filed on January 29, 2014 in the Wolf brother's bankruptcy cases, the Wolf Individuals are co-borrowers on three loans from FirstMerit or its predecessor in interest from 2008 with a total balance of at least $11,010,842.54 as of the petition date in the Wolf brothers' cases. To secure these loans, the trustee for the 10611 Wolf Dr. land trust executed a mortgage and an assignment of rents in favor of FirstMerit's predecessor in interest and the Wolf Individuals signed a collateral assignment of beneficial interest to FirstMerit. (FirstMerit Ex. 31.) Several Chardon Debtors also guaranteed these debts. According to FirstMerit's original proof of claim, the Wolf Individuals are guarantors on three other debts to FirstMerit of certain Chardon Debtors with a total balance of at least $4,142,305.18. Additionally, Donald Wolf Sr. alone guaranteed a debt owing from one of the Chardon Debtors to FirstMerit with a petition date balance of at least $710,423.95. Pursuant to a Cross-Default and Cross-Collateralization Agreement signed by the Chardon Debtors and the Wolf Individuals in August 2010, the Chardon Debtors and the Wolf Individuals agreed to cross-collateralize and cross-default the various obligations of those borrowers and guarantors to FirstMerit. Based on the original proof of claim, the total indebtedness of the Wolf brothers as of the date of their petition was at least $15,153,147.72. An officer for the bank testified at trial that the Wolf brothers owed an additional $325,000 in prepetition interest, $1,650,000 in postpetition interest and $1,300,000 in attorneys' fees, totaling $18,428,147. The Debtors dispute this amount, primarily arguing that FirstMerit should not be entitled to interest at the contractual default rate, but have not yet objected to FirstMerit's claim.

The Chardon Debtors filed a plan of reorganization on August 15, 2013. (Chapter 11 Plan of Reorganization ("Chardon plan"), Case No. 13-B-81372, ECF No. 220). It provides for

payment in full of each of FirstMerit's, Colfin's and Old Second's claims, including approved attorneys' fees and costs and accrued interest at the non-default contractual rate. The plan proposes to pay both FirstMerit's and Colfin's claims in monthly installments with 4.00% a.p.r interest, with interest-only payments for the first 36 months, interest and principal on a 30-year amortization schedule for months 37 through 83, and the full remaining amount due on the 84th month after confirmation. *Id.* at 13-15. Old Second's claim is to accrue interest at 4.25% a.p.r., and be paid down in monthly installments on a 25-year amortization schedule with the full remaining amount due on the 84th month after confirmation. *Id.* at 16-17. Priority claims are to be paid upon confirmation or 14 days after approval, and general unsecured claims are to be paid in full within 60 days after confirmation. *Id.* at 17. Equity interests are not impaired by the plan. *Id.* Prepetition lawsuits by FirstMerit and Colfin against the Wolf Individuals and certain Chardon Debtors are to be dismissed upon confirmation under the plan. The plan provides that all creditors of the Chardon Debtors are "permanently enjoined from commencing, conducting or continuing in any manner, directly or indirectly, any lawsuit, action or other proceeding of any find against or affecting the [Chardon] Debtors, their affiliates or any officer, director, member, shareholder, agent, attorney or other professional or other representative of the [Chardon] Debtors." *Id.* at 22. The plan provides that upon confirmation "Donald L. Wolf, Sr., Donald L. Wolf, Jr., David Wolf shall cause [the 10611 Wolf Dr. Property] to be transferred to the Reorganized Debtor, in fee simple, subject to all then-existing mortgages and liens." *Id.* at 11. Finally, the Chardon plan provides for substantive consolidation of the Chardon Debtors, with:

a. For bankruptcy and creditors' rights purposes, and for purposes of the Plan alone, commencing upon the Effective Date, the assets of any Consolidating Entity shall be treated as assets of the Reorganized Debtor.
b. For bankruptcy and creditors' rights purposes, and for purposes of the Plan alone, commencing upon the Effective Date, the liabilities of any Consolidating Entity shall be treated as liabilities of the Reorganized Debtor.

*Id. at* 9.

On September 19, 2013, the court in one of FirstMerit's lawsuits[3] against the Wolf

Individuals entered a judgment for breach of the September 2008 Note in favor of FirstMerit, and

against the Wolf Individuals, jointly and severally, in the amount of $6,700,709.95, which

judgment is secured by 10611 Wolf Dr. (Joint Stip., ¶¶34-39.)  On October 21, 2013, David

Wolf and Donald Wolf, Jr. each filed petitions with this court for protection under Chapter 11.

On October 28, 2013, Donald Wolf, Sr. filed a voluntary petition for relief under Chapter 11 in

the Middle District of Florida.  Donald Wolf, Sr.'s case was ordered transferred to the Northern

District of Illinois on June 18, 2014.  On July 2, 2014, this court entered an order directing the

joint administration of the three Wolf Individuals' cases with the Chardon, LLC case.[4]

Donald Wolf Sr. filed a plan and disclosure statement while his case was pending in

Florida on February 24, 2014.  David and Donald Wolf, Jr. filed plans and disclosure statements

in their respective cases on the same day.  The treatment of creditors in the Wolf Individuals'

cases is similar to that in the Chardon Debtors' with a few notable differences.  First, the claims

of all three main creditors (FirstMerit, Colfin and Old Second) are to be paid with 4.25% a.p.r.

interest, with interest only payments for the first 24 months, interest and principal on a 25-year

amortization schedule for months 25 through 59, and the remaining due balance on the 60th

---

[3] *FirstMerit Bank, N.A. v. Donald L. Wolf, Sr. et al.*, Case No. 13 C 2661 (N.D. Ill 2013).
[4] FirstMerit filed a motion to lift the stay with respect to 10611 Wolf Dr. in Donald Wolf Sr.'s case while it was pending in Florida on November 25, 2013. (FLMB doc. 40.) The motion was granted on February 4, 2014 (FLMB doc. 123) after briefing and argument.  A motion to reconsider was filed February 28, 2014 (FLMB doc. 137) and a similar motion filed May 22, 2014. (FLMB doc. 198.) The motion to vacate was granted May 28, 2014. (FLMB doc. 200.)  But a motion was filed to reconsider the order vacating the stay lift motion on June 11, 2014. (FLMB doc 213.)  This motion was still pending when the case was transferred to the Northern District of Illinois on June 18, 2014.  However, the parties signed a stipulation, approved by order of Judge Delano in Florida on June 20, 2014 stipulating that the trial and ultimate ruling by the Illinois court on First Merit's motion for stay relief in Wolf brothers' cases would be binding on Donald Wolf Sr. and FirstMerit with respect to FirstMerit's motion in his case. (ILNB No. 14-B-81919, ECF No. 22.)

month after confirmation.[5]    Second, other than the appearance of the term "substantively

consolidating" in the titles of David and Donald Wolf, Jr.'s plans and a few stray references to an

undefined term "Consolidating Entity" neither plan provides for substantive consolidation.

Third, the Wolf Individuals' plans all state that the plan obligations will be paid in part from

income from the 10611 Wolf Dr. Property and that the Chardon Debtors will pay certain plan

obligations to be guaranteed by the Wolf Individuals.    Fourth, the Wolf Individuals' plans

provide that two of the FirstMerit Collateral Properties, 610 N. Route 31, Crystal Lake  and

9340 Virginia Rd., Crystal Lake, will be placed for sale for minimum sale prices of $1,146,670,

and $1,080,943 respectively. The net proceeds from the sale will be paid to FirstMerit towards its

claim, and if they are not sold within one year, the properties are will be surrendered to

FirstMerit in exchange for a credit of the minimum sale price toward the bank's claim. (Chardon

plan, p.13.)

The parties entered into certain factual stipulations (No. 13-B-83572, ECF No. 70, No.

13-B-83571, No. 77), following which the court held a trial over three days during which the

court received exhibits and heard the testimony of Thomas Maxwell, senior vice president at

FirstMerit, Donald Wolf, Jr., David Wolf, Eric Enlow, a real estate appraiser at Integra Realty

Resource, Peter Helland, a real estate appraiser at Real Valuation Group LLC, and Ronald G.

Javorek, an accountant and financial consultant for the Debtors.    Included among FirstMerit's

exhibits were July 17, 2013 appraisals of the eight FirstMerit Collateral Properties by Integra

Realty Resources, valuing 10611 Wolf Dr. at $3,800,000 and the combined FirstMerit Collateral

Properties at $14,750,000. (First Merit Ex. 1–9).    Included among the Debtors' exhibits were

February 17, 2014 appraisals by Real Valuation Group of three of the FirstMerit Collateral

---

[5] Donald Wolf Sr.'s plan provides for payment in full to two additional secured creditors, Bank of the West and
Crystal Lake Bank for a boat loan and a home mortgage loan.  Donald Wolf Jr.'s plan also provides for payment in
accordance with the contract terms for a home mortgage loan to BMO Harris. (FLMB doc. 53)

Properties, valuing: 10611 Wolf Dr. at $4,200,000 ($400,000 higher than FirstMerit's appraisal),

9342 Virginia Rd., Lake in the Hills at $1,000,000 ($150,000 higher than FirstMerit's appraisal),

and 691 Virginia Rd., Lake in the Hills at $1,800,000 ($340,000 higher than FirstMerit's

appraisal). (Debtors' Ex. 1-3). As such, evidence was presented that the FirstMerit Collateral

Properties in the aggregate are worth between $14,750,000 and $15,640,000. FirstMerit's

appraisals also contained historical and projected aggregate and net rents for each property,

showing projected annual gross revenues from the FirstMerit Collateral Properties of $2,149,383,

and actual annual gross revenues of $1,990,049 for the last full calendar year for which the

appraiser had information. The appraisals projected annual net revenue (gross revenue less all

expenses related to the properties other than debt service) of $1,304,643, and actual net revenues

of $985,138 for the last calendar year for which data was available. The appraisals also showed

that the properties had high current occupancy, ranging from 60% to 100%.

## DISCUSSION

FirstMerit Bank, N.A. ("FirstMerit") seeks relief from the automatic stay in the jointly

administered cases of David Wolf and Donald Wolf, Jr. (the "Debtors" or the "Wolf brothers")

to pursue non-bankruptcy remedies against 10611 Wolf Dr. FirstMerit makes two arguments in

support of its request for stay relief. First, it argues that 10611 Wolf Dr. is not property of either

the Wolf Individuals' or any of the Chardon Debtors' bankruptcy estates because it is held in a

land trust. In the alternative, FirstMerit argues that the Debtors do not have equity in 10611

Wolf Dr. and the property is not necessary for Debtor's effective reorganization.

### A. THE UNDERLYING REAL ESTATE IS ITSELF PROPERTY OF THE DEBTORS' ESTATES

FirstMerit first suggests that, because the 10611 Wolf Dr. real estate is owned by a land

trust in which the Wolf Individuals are beneficiaries, the real estate itself is not property of their

estates and the automatic stay does not apply.  According to FirstMerit the beneficial interest in

the land trust is property of the estate but not the land itself. The movant contends, therefore, that

the automatic stay should not prevent attempts to enforce a debt directly against the real estate.

To support its argument FirstMerit submitted evidence both of a collateral assignment of

beneficial interest signed by the Wolf Individuals and of a mortgage signed by the land trust

trustee.

A land trust is "a fiction which has become entrenched in the law of this State and

accepted as a useful instrument in the handling of real estate transactions." *People v. Chicago*

*Title & Trust Co.*, 389 N.E.2d 540, 545 (Ill. 1979). In discussing Illinois land trusts, the Seventh

Circuit Court of Appeals has held that a bankruptcy court can "look[] through the form to the

substance of the transaction" and determine that a debtor who is the sole beneficiary of an

Illinois land trust is the "equitable owner of real property."  *In re Gladstone Glen,* 628 F.2d

1015, 1018-19 (7th Cir. 1980). Although *Gladstone Glen* dealt with eligibility as a debtor under

the pre-1978 Bankruptcy Act, subsequent discussions of the Seventh Circuit have held that real

property held by a bankruptcy debtor through a land trust nonetheless is property of the

bankruptcy estate.   While "*Gladstone Glen* was decided prior to the Bankruptcy Code's

promulgation ... the analysis in the Seventh Circuit's opinion was equally applicable to § 541 of

the Bankruptcy Code." *Hopkins Ill. Elevator Co. v. Pentell (In re Pentell)*, 777 F.2d 1281, 1284

n. 2 (7th Cir. 1985).

*Pentell,* a case where the property was determined not to be property of the estate,

highlights key factual considerations for the present case.  First, in *Pentell* the underlying real

estate at issue was owned not only through a land trust but also, in turn, through a partnership in

which  the debtor held a 30% interest.  Second, the "property" in that case was not the real estate

itself but rather insurance proceeds stemming from a fire. The decision largely turned on the latter difference, as the court found that the insurance proceeds were a contractual right based on a contract of insurance between the partnership and the insurance company and therefore were "an asset of the partnership unconnected to the real property insured." *Id.* at 1284. However, the court also noted that the result was the same with respect to the real estate itself because of the existence of the partnership. "[W]ere this the bankruptcy of the partnership we would have no trouble including the [real] property in the estate," but the debtor himself had "only an indivisible joint interest in specific partnership property." *Id.* at 1284 n.2.

The court noted that whether property is property of the estate is "a matter of federal bankruptcy law regardless of how the state characterizes the actual legal ownership of the property." *Id.* Applying the 'substance over form' doctrine to 'Illinois-type' land trusts, the court found that "the beneficiaries' equitable interest in the trust made the real property part of the debtor beneficiary's estate." *Id. See also Smith v. First Suburban Nat'l Bank (In re Smith),* 224 B.R. 388, 398 (Bankr. N.D. Ill. 1998) (finding that attempt to collect a discharged debt against real estate held in an Illinois land trust in which debtor was a beneficiary was a violation of the discharge injunction); *U.S. v. N. States Invs. Inc.,* 670 F. Supp. 778, 786 (N.D. Ill. 2009) (because a beneficiary of a land trust "still controls the property at issue … a tax lien that attaches to the beneficial interest also attaches to the real property, and therefore can be foreclosed against such property").

The court in *Gladstone Glen* relied primarily on the reasoning and description of a beneficiary's interest in real estate held by a land trust set forth in *People v. Chicago Title & Trust Co.,* 389 N.E.2d 540 (Ill. 1979). There, the Illinois Supreme Court found that for purposes of an action to collect unpaid property taxes a beneficial interest holder could be treated as the

"owner" of the real property. The court noted that the Illinois land trust "is a unique creation of the Illinois bar" that has mainly "served as a useful vehicle in real estate transactions for maintaining secrecy of ownership and allowing ease of transfer." 389 N.E.2d at 543. The court distinguished the concept of title which "refers only to a legal relationship to the land," from the concept of ownership which "is comparable to control and denotes an interest in the real estate other than that of holding title thereto." *Id.* at 544. While title might be relevant for some purposes, "where the primary issue involves ownership rather than title … reliance on bare legal title would be inappropriate." *Id.* The "key elements of ownership are control and the right to enjoy the benefits of the property," and the court found that under the trust agreements at issue "most of the usual attributes of real property ownership are retained by the beneficiary." *Id.*

In the present case, the key elements of ownership are clearly placed with the beneficiaries of the land trust and not the trustee. The land trust agreement provides that:

> The beneficiaries shall have the sole possession, management and control of the selling, renting, repairing, maintaining and handling of the property and the trustee shall have no right or duty in respect to any such matters. The beneficiaries shall have the right to execute leases and collect rents in their own name or through their agents. The trustee shall have no right or duty in respect to the payment of taxes or assessments or insurance, litigation or other matters relating to the property, except on written direction accepted by it as above provided and after the payment to it of all money necessary in its opinion to carry out the directions without liability to it.

(FirstMerit Ex. 32, ¶ 15). Thus, like in *Chicago Title*, all control over and benefits of the real property belong to the beneficiaries, and the land trust trustee has no discretion to take any action with respect to the property except at their direction.

FirstMerit acknowledges this case law, but argues that the holding in *Gladstone Glen* and similar cases should be limited to situations where a single individual owns 100% of the beneficial interests in the land trust. Here, there are three different Wolf family members who

each own less than 100% of the beneficial interests. However, FirstMerit fails to explain why the result would be different when there are multiple beneficiaries.

Illinois law provides for numerous forms of joint ownership of real estate, including joint tenancy, tenancy in common and tenancy by the entirety. *See, e.g., Sathoff v. Sutterer*, 869 N.E.2d 354 (Ill. App. Ct. 2007). The reasoning of *Chicago Title*, *Gladstone Glen* and *Pentell* suggests that, so long as the trust agreement places the key elements of ownership in the beneficiaries and not the trustee of a land trust, each beneficiary will be treated as holding some undivided partial interest in the underlying property and such interest would be part of the beneficiary's bankruptcy estate for purposes of Section 541. Indeed, in *Chicago* Title, the court speaks of the beneficiaries at issue in the plural, stating that, "[i]n examining a land trust it is apparent that true ownership lies with the *beneficiaries* though title lies with the trustee." 389 N.E.2d at 545 (emphasis added). Similarly, the court in *In re Carlson* looked through a land trust to the beneficial interest holders for purposes of the attachment of a federal tax lien on real property even though both joint debtors were beneficial interest holders, albeit with no discussion of the issue. 126 F.3d 915 (7th Cir. 1997) ("Thus the real 'owners' of the Lake Shore Drive property-the Carlsons-were notified of the liens."). An Indiana bankruptcy court applying Illinois law also found that underlying real estate held in a land trust in which two joint debtors each held beneficial interests was property of their bankruptcy estates. *In re Langley*, 30 B.R. 595 (Bankr. N.D. Ind. 1983). While the court "reserv[ed] for another day its opinion regarding what impact, if any" it would have had if it were "a case in which there are numerous beneficiaries of the land trust some of whom are not debtors in a bankruptcy proceeding," the court "concluded that the realty held in the Langley Land Trust is property of the estate." *Id.*

Here, too, all three beneficial interest holders in the land trust for 10611 Wolf Dr. are

bankruptcy debtors before this court whose cases are being jointly administered by the court. Therefore, the court has no trouble concluding that the Wolf Individuals are to be treated as proportional owners of the underlying real estate and such interest is property of their respective bankruptcy estates.

B. *THE REAL ESTATE IS NECESSARY FOR THE DEBTORS' EFFECTIVE REORGANIZATION*

Relief from the automatic stay is warranted if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2).[6] The party requesting relief from the stay has the burden of proof on the issue of the debtor's equity in property; and the party opposing such relief has the burden of proof on all other issues. 11 U.S.C. §362(g). Here, the court determined prior to trial that for purposes of Section 362(d)(2)(A) the Debtors lack equity in the 10611 Wolf Dr. (See Order, Feb. 19, 2014, Case No. 13-B-83571, ECF No. 62; Order, Feb. 19, 2014, Case No. 13-B-83572, ECF No. 56.)

The burden is on the Debtors to prove that the 10611 Wolf Dr. property is necessary to their effective reorganization. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375-76 (1988). This requires "not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect, [which means] there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" *Id.* Courts generally "demand less detailed showings during the four months in which the debtor is given the exclusive right to put together a plan" but even within that period will grant relief from stay if there is no "realistic prospect of effective reorganization." *Id.* at 376.

---

[6] FirstMerit does not allege lack of adequate protection or other "cause" to lift the stay under Section 362(d)(1).

Motions for relief from stay are generally expedited hearings and greatly limited in scope. *In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1234 (7th Cir. 1990). Therefore, a hearing on a motion for relief from stay is more limited than a confirmation hearing, and the debtor's evidence as to the feasibility of a proposed plan will be subjected to a lower level of scrutiny. *Edgewater Walk Apartments v. MONY Life Ins. Co. of Am.*, 162 B.R. 490, 499 (N.D. Ill. 1993). However, since a plan will need to satisfy the requirements set forth in Section 1129(a), even in the case of a motion for stay relief "section 1129 can provide some guidance in analyzing the feasibility of a plan." *Id.* at 499 (quotation marks omitted). Here, as often is the case for questions of necessity to effective reorganization under Section 362(d)(2), the key factual issue is how much the creditors are entitled to receive under a confirmable plan and whether the debtor can generate enough cash flow to maintain both its operations and to make such required payments to creditors under the plan. *In re Settlers' Hous. Serv. Inc.*, 505 B.R. 483, 490 (Bankr. N.D. Ill. 2014).

1. **FirstMerit's Objections to the Proposed Plans of the Wolf Individuals and the Chardon Debtors**

FirstMerit's primary arguments under Section 362(d)(2) are twofold. First, it argues that the currently proposed plans of the Wolf brothers and of the Chardon Debtors cannot be confirmed over FirstMerit's objection. Next, it argues that the Debtors do not have enough income to propose a feasible plan that could be confirmed over FirstMerit's objection – at least if the debtors intend to keep 10611 Wolf Dr. Generally a Chapter 11 plan can be 'crammed down' on a nonconsenting class of creditors only if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2069 (2012) (quoting 11 U.S.C. § 1129(b)(2)(A)).

### a. Debtor's Proposed Treatment of FirstMerit Claims and Ability to Pay Those Claims

For a plan to be deemed "fair and equitable" with respect to a nonconsenting secured creditor's claim, the plan must either (i) provide that the secured creditor will retain its lien on the property and receive deferred cash payments, (ii) provide for sale of the property with the creditor's lien to attach to the proceeds, or (iii) provide the creditor with the "indubitable equivalent" of its claim. *RadLAX*, 132 S. Ct. at 2070. Here, the Debtors propose to keep 10611 Wolf Dr. and provide FirstMerit with deferred cash payments through the plan. To do so, the payments on FirstMerit's secured claim under the plan must total "at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." 11 U.S.C. § 1129(b)(2)(A)(i). The statutory reference to "value as of the effective date of the plan" has been interpreted as meaning the "present value" of the claim, which must include "the amount of the underlying claim plus an appropriate amount of interest to compensate the creditor for the decreased value of the claim caused by the delayed payments." *Airadigm Communications Inc. v. Fed. Communications Comm'n (In re Airadigm Communications, Inc.)*, 547 F.3d 763, 769 (7th Cir. 2008) (citing *Rake v. Wade*, 508 U.S. 464, 472 n. 8 (1993)). In other words the plan must provide for payment of interest if the claim is to be paid over time. *Id.* (citing *Timbers*, 484 U.S. at 377). It is for the bankruptcy court to determine the appropriate rate of interest for confirmation purposes rather than any contractual rate. *In re Wright*, 492 F.3d 829, 830 (7th Cir. 2007). According to the plurality opinion in *Till v. SCS Credit Corp.*, the appropriate rate of interest is the nationally published prime rate plus an appropriate risk adjustment, although the Court acknowledged that in a Chapter 11 case "it might make sense to ask what rate an efficient market would produce." 541 U.S. 465, 476 n.14. Such "efficient market," is a market for "financing for Chapter 11

debtors in possession" and *not* simply the market outside of bankruptcy for loans with similar terms or collateral. *Id.*

In the context of this motion for stay relief, neither the movant nor the Debtors have provided the court with much evidence on the appropriate rate of interest. Neither side provided any evidence of a market rate for DIP financing and neither side provided any evidence of the current prime rate of interest much less what an appropriate risk adjustment would be. Instead, the only evidence presented was the testimony of the Debtors' financial consultant, Ronald G. Javorek, and certain comments contained in written appraisals offered by the Debtors and by FirstMerit. Mr. Javorek testified that he believed 4.25% a.p.r to be a "reasonable market rate" for loans secured by property of similar nature and location as FirstMerit's collateral, but he also testified that "4.25 to 5.25 percent would be a reasonable commercial range." (Trial Tr. Day 2, 134:13 – 135:5, March 6, 2014; Trial Tr. Day 3, 54:7-55:4, April 2, 2014.) A February 2014 appraisal of 10611 Wolf Dr. by Edward Kling submitted by the Debtors included a statement that, based on conversations with local lenders, he believed that "typical financing for the subject property as an owner-occupied building would likely be based on a 70% percent loan-to-value ratio, a 5.50% fixed interest rate, and a 25 year amortization period, with refinancing required after five years." (Debtors' Ex. 8, pg. 42.) In contrast, FirstMerit's July 2013 appraisal of 10611 Wolf Dr. by Integra Realty Resources describes as "typical financing terms" for similar property loans a loan with a 65% loan to value ratio, 5.00% a.p.r. interest rate and 25 year amortization. (FirstMerit Ex. 1, pg. 60.)

Although Mr. Javorek was not a particularly compelling witness and although both the testimony of Mr. Javorek and the statements in the two appraisals related to financing outside the context of a bankruptcy and to loans with different loan to value ratios than the properties in this

case, there was no other evidence presented on the issue of an appropriate interest rate. Nor was other evidence presented on the adjustments from those rates that should be made to determinine an appropriate rate of interest for purposes of Section 1129(b)(2)(A). The court will not speculate on what such adjustments should be. In any event, the matter is before the court on a motion for relief from stay, and not plan confirmation. The court finds that there is at least a reasonable possibility that a plan that provided for interest on FirstMerit's secured claim at a rate of between 4.25% and 5.50% would satisfy Section 1129(b)(2)(A)(i).

Mr. Javorek testified that, based on his analysis of the Debtors' leases and historical cash flow of rents from the FirstMerit Collateral Properties, he believes that the Debtors would be able to make interest payments to FirstMerit at an interest rate of 4.25% or even 5.25%, though he also admitted that he had not tried analyzing the issue using a 5.50% rate. (Trial Tr. Day 3, 83:12-84:11.) FirstMerit offered no competing evidence to dispute the projected cash flow. Moreover, Mr. Javorek's opinion appears to be consistent with both the projected and actual cash flows described by FirstMerit's appraisals of the FirstMerit Collateral Properties. According to the Integra Realty Resources July 2013 appraisals, the FirstMerit Collateral Properties are projected to generate annual gross revenues of $2,149,383, and generated actual annual gross revenues of $1,990,049 for the last full calendar year for which the appraiser had information.[7] (FirstMerit's Exs. 1 – 8.) In the same appraisals, the appraiser projected the annual net revenue (gross revenue less all expenses related to the properties other than debt service) to be $1,304,643, and found that the properties had generated actual net revenues of $985,138 for the last calendar year for which data was available. *Id.*

Although there was some dispute over the exact amount of FirstMerit's claim, FirstMerit

---

[7] For 610 N. Route 31, Crystal Lake, Illinois, this was 2012. For all other properties, the most recent information was for 2011.

initially filed a proof of claim for $15,153,147.72 constituting the aggregate joint debt of all of

the Chardon Debtors and the Wolf Individuals to FirstMerit as of the petition date, which the

bank subsequently amended to $16,263,291.41. The highest amount of the debt which

FirstMerit provided evidence to support was $18,428,147, based on its officer's testimony that

the principal debt was $15,153,147 plus $325,000 in prepetition interest, $1,650,000 in

postpetition interest and $1,300,000 in accrued costs and attorneys' fees. (Trial Tr. Day 1, 35:5-

36:2.) The Debtors dispute this amount, apparently on their belief that interest should not have

accrued at the contractual default rate but instead at a lesser rate.[8]  On cross-examination, Mr.

Javorek admitted that "if you added in 1.6 million dollars of post petition default interest [he]

would have a tough time showing that [the proposed plan] would be [feasible.]" (Trial Tr. Day 3,

84:23-25.)  However, based on the projections by FirstMerit's appraiser, even were the court to

accept the $18.4 million figure as the amount of the debt, to accept the full amount as fully

secured for purposes of Section 1129(b)(2)(A), and to accept the higher interest rate of 5.5% as

the appropriate discount rate, the projections of the bank's appraiser still show that the Chardon

Debtors and the Wolf Individuals will generate enough net rental income from the FirstMerit

Collateral Properties to pay FirstMerit not only 5.5% interest on its claim, and also generate

almost $300,000 in additional annual income to pay towards principal reduction or other costs.[9]

At 4.25%, this surplus would increase to almost $525,000.[10]

First Merit also disputes whether it is feasible for the Chardon Debtors or the Wolf

Individuals to refinance their debt secured by the FirstMerit Collateral Properties in five years, as

---

[8] There was also a dispute over whether and to what extent FirstMerit's claim is undersecured. This was discussed in the context of loan to value rates and the possibility of refinancing. Neither party discussed the effect any lack of security would have on the required treatment for FirstMerit's claim under Section 1129(b). The proposed plans all appear to provide for payment of FirstMerit's claim in full with interest. Therefore, for purposes of this motion for relief from stay only, the court will treat the full claim of FirstMerit as fully secured for purposes of Section 1129(b).
[9] $18,428,147 X .055 = $1,013,548.09.  $1,304,643 – $1,013,548.09 = $291,094.92.
[10] $18,428,147 X .0425 = $783,196.25.  $1,304,643 – $783,196.25 = $521,446.75.

required by the plan. In particular, FirstMerit suggests that the Debtors will only be able to

refinance up to 70% of the value of the collateral. Although there was a dispute over the values

of both the current values of the FirstMerit Collateral Properties and FirstMerit's claim, it is

undisputed that the current claim is well in excess of 70% of the value of the properties.

However, payments of principal through the plan would improve the Debtors' loan to value ratio,

as would appreciation in the value of the underlying collateral. FirstMerit's appraiser, Integra

Realty Resources, stated in its July 2013 appraisal of 10611 Wolf Dr. that it expects property

values in the area to "stabilize in the near future and increase over the long-term." (FirstMerit

Ex. 1, pg.16.) For the other FirstMerit Collateral Properties, the appraisal indicated that property

values in the area were likely to remain stable or increase.

Even plan confirmation requires some amount of prediction. The standard of proof is

lower for a motion for relief from stay. See, e.g., *In re Cadwell's Corners P'ship*, 174 B.R. 744,

759 (Bankr. N.D. Ill. 1994) ("Even at the later stages, a motion for relief from stay should not be

turned into a confirmation hearing.") (citing *In re Ashgrove Apartments of DeKalb County, Ltd.*,

121 B.R. 752, 756 (Bankr. S.D.Ohio 1990)). For purposes of stay relief, the court finds that the

Debtors have met their burden of demonstrating that they are reasonably likely to be able to

propose a feasible and confirmable plan of reorganization which provides for the retention of

10611 Wolf Dr. within a reasonable time.

**b.  Reliance on the Chardon Plan**

FirstMerit also argues that any income or assets of the Chardon Debtors should be

ignored in determining whether the Wolf Individuals can propose a feasible and confirmable

plan. FirstMerit objects that the individual income and assets of the Wolf brothers are

insufficient to repay each individual's indebtedness to FirstMerit in full. Therefore, according to

FirstMerit, neither of them can feasibly propose a plan of reorganization in which they maintain

possession of 10611 Wolf Dr. The plans filed by the two Wolf brothers do not propose to rely

only on Debtors' individual income to repay such debt. Each has filed a plan of reorganization

that provides for certain payments to joint creditors from the Chardon entities through a plan of

reorganization in the Chardon Debtors' cases in addition to direct payments by the Wolf

Individuals. FirstMerit objects, asserting without explanation that reliance on payments from the

Chardon Debtors through their plan is somehow improper.

   The proposed payments by the Chardon Debtors are not speculative. The plan does not

depend on a nondebtor outside the bankruptcy court's jurisdiction to voluntarily choose to make

payments to the Wolf Individuals or their creditors. Instead, the Chardon Debtors will be

compelled to make such payments pursuant to a binding Chapter 11 plan in those entities' own

bankruptcy cases. Their individual cases, of course, also are before this court and are being

jointly administered with the Wolf Individuals' cases.

   Nor can such payments be considered to be a mere gift to the Wolf Individuals. As

FirstMerit admits, one or more of the Chardon Debtors are jointly liable on each debt of the Wolf

Individuals to FirstMerit. Therefore, the payments by the Chardon Debtors to FirstMerit would

be on those entities' own behalf in addition to benefiting the Wolf Individuals. FirstMerit's

proofs of claim in the Wolf Individuals' cases admit that for every loan obligation that the Wolf

brothers owe to FirstMerit, either such obligation is guaranteed by one or more of the Chardon

Debtors or the direct borrower is one of the Chardon Debtors and the Wolf brothers are

guarantors. Additionally, its proofs of claim admit that the Wolf Individuals and the Chardon

Debtors entered into an agreement with FirstMerit to cross-collateralize and cross-default all of

their indebtedness to FirstMerit for all of these obligations. The Chardon Debtors are themselves

contractually obligated to make payments on the debts for which they are jointly liable. There is

no inherent or *per se* reason why the Chardon Debtors would not be able to propose a

confirmable plan that proposes to pay debts for which the Wolf Individuals are jointly liable

using rents and other funds generated by properties owned by those entities. Indeed, there is

more assurance that payments by those entities will in fact be made if the obligations are

pursuant to a confirmed and binding plan, and subject to this court's jurisdiction. *Cf. In re Strug-*

*Division, LLC*, 375 B.R. 445, 449 (Bankr. N.D. Ill. 2007) (the decision not to give the

bankruptcy court jurisdiction over properties owned by nondebtor entity but which were

supposedly to be used in proposed plan is bad faith).

FirstMerit also objects that there are inconsistencies between the Chardon Debtors'

current proposed joint plan and the proposed plans of the Wolf brothers, such as whether 10611

Wolf Dr. will be transferred from the Wolf Individuals to the Chardon Debtors and whether the

interest rate to FirstMerit will be 4.0% or 4.25%. However, these inconsistencies largely stem

from the timing of the two cases, as the Chardon Debtors' plan was filed before the Wolf

Individuals had filed petitions for bankruptcy protection. The Chardon Debtors filed a joint plan

of reorganization on August 15, 2013, two months before the Wolf brothers filed their individual

bankruptcy petitions on October 21, 2013. David and Donald Wolf Jr. each filed their plans of

reorganization, together with disclosure statements, on February 24, 2014. Donald Wolf Jr.

testified that to the extent that there was any inconsistency between the plans, the Chardon

Debtors' plan would be amended. (Trial Tr. Day 1, 102:12-15.)

FirstMerit also criticizes the delays in the Chardon Debtors' case, including the failure to

yet amend the plan or file a disclosure statement even though the case has been pending since

April 17, 2013. The bank argues that this demonstrates that the Chardon Debtors will not be able

to have a plan confirmed within a reasonable time and by implication neither will the Wolf Individuals. However, the Chardon Debtors' case has been beset from the outset by unusual circumstances, notably the extended discovery and trial on the contested application to employ counsel sought by FirstMerit and on FirstMerit's motion to appoint a Chapter 11 trustee. But, the trial on those matters has not yet concluded, and it is difficult for the Chardon Debtors to solicit ballots and pursue confirmation when their counsel has not even yet been approved.

These delays are not without end, however. The trial on those matters has already commenced. In any event, the exclusivity period for filing a plan in the Chardon Debtors' case has been extended through October 17, 2014, and to obtain acceptance through December 17, 2014, so there is no apparent danger that the case will go on indefinitely without confirmation of a plan.

### c. Substantive Consolidation

FirstMerit next contends that the Wolf Individuals' and the Chardon Debtors' plans all rely on substantive consolidation and argues that substantive consolidation is inappropriate because FirstMerit dealt with the Chardon Debtors and the Wolf Individuals as separate identities or economic units and lent against specific property of specific debtor. (FirstMerit's Memorandum in Support of Motion, David ECF No. 112, pgs. 6-7.) Although all plans filed have one or more references to substantive consolidation, it is not clear at this juncture to what extent the debtors seek or need to consolidate their cases. By FirstMerit's own admission, the corporate and individual debtors do not seem to be seeking true substantive consolidation. *Id.*, pgs. 6-7 ("Furthermore, the Chardon Plan proposes to use substantive consolidation on a limited basis solely for purposes of confirmation – the substantive consolidation would otherwise have no impact the Chardon debtors and the Wolf Individuals after confirmation."). Nor is it clear

that substantive consolidation is a necessary element of the Chardon Debtors' plan rather than merely a convenience for administration. As discussed above, the Chardon Debtors and Wolf Individuals appear to be capable of repaying FirstMerit's debt solely from the rents and other proceeds of FirstMerit's collateral and, as noted below, the various debtors do not appear to intend to repay any other creditors (including Colfin and Old Second) out of the rents or proceeds of FirstMerit's collateral.

Additionally, based on post-trial developments and proposed settlements with the Debtors' other major creditors,[11] it does not appear that FirstMerit would suffer any prejudice by substantive consolidation. FirstMerit shortly may well become the only substantial creditor for the debtors and its debts are already cross-collateralized.   Substantive consolidation is an equitable doctrine whereby "the corporate forms of the entities involved are disregarded, assets are pooled into a single pot, and all claims against the debtors proceed against that pot of assets." *Grand Pier Center LLC v. ATC Group Services, Inc.*, Nos. 03-C-7767, 05-C-1156, 2007 WL 2973829 (N.D. Ill. Oct. 9, 2007). The main danger of prejudice to creditors by substantive consolidation is that a creditor that chose to lend to one consolidated entity with many assets may have to share in distribution of those assets with less wise or fortuitous creditors who lent to another consolidated entity with fewer assets.   Courts have also focused on the impact of consolidation upon creditors of the entities to be consolidated and balance whether the creditors would be unfairly prejudiced or treated more equitably by substantive consolidation. *Paloian v. LaSalle Bank N.A. (In re Doctors Hosp. of Hyde Park, Inc.)*, 507 B.R. 558, 707 (Bankr. N.D. Ill. 2013).   This is usually less of an issue for secured debts. Even with respect to consolidating

---

[11] One of which was approved, *see* Order Granting Mot. to Approve Settlement Agreement Between Debtors and Colfin BAMO II Funding A, LLC, *In re Chardon LLC,* Case No. 13-B-81372 (ECF No. 816) ("Order Approving Colfin Settlement") and the Rule 9019 motion for the other is now before the court, see, Mot. to Approve Compromise per Rule 9019 with Old Second National Bank, *Id.* at ECF 936.

entities, a creditor with a security interest in specific property has greater rights to distribution from that property than other creditors. But where, as here, property is to be retained and not sold, consolidation could adversely affect the timing or risk of repayment or the sharing or use of rents and other income generated by collateral.

Here, the schedules of the Chardon Debtors reveal that they have three major secured creditors, FirstMerit, Colfin, and Old Second, each of which lent against separate real estate collateral. Other than a few property tax debts and some intercompany loans, the Chardon Debtors have no other significant debts to any third parties. As between the three main creditors, FirstMerit's concern would be understandable if the Debtors intended through substantive consolidation to pay Colfin or Old Second on their claims using rents or proceeds of FirstMerit Collateral held by an entity to which Colfin or Old Second did not lend money. However, it does not appear that either the Chardon Debtors or the Wolf Individuals intend to do so. Instead, the Debtors have already entered into a settlement agreement with Colfin to surrender certain of Colfin's collateral in satisfaction of debt to Colfin and to sell or surrender the remaining Colfin collateral within a year in satisfaction of the remaining debt. (Order Granting Colfin Settlement, Case No. 13-B-81732, ECF No. 816). The Debtors have apparently entered into a similar agreement with Old Second that has not yet been approved by this court. (See Debtor's Mot. to Approve Compromise with Old Second, Case No. 13-B-81732, ECF No. 936). If FirstMerit is left as the only creditor of the Chardon Debtors and the Wolf Individuals, it is difficult to see how it would be prejudiced by substantive consolidation. Further, because FirstMerit has already contractually agreed to the cross-collateralization of all or most of its loans to the various Chardon Debtors and Wolf Individuals, treating its claim as a claim against all the debtors would not be inconsistent with its prepetition bankruptcy position.

At the very least, since the Chardon Debtors' and Wolf Individuals' plans will need to be amended to incorporate the terms of the settlements with Colfin and Old Second, the propriety of substantive consolidation seems better addressed at plan confirmation than in this motion for relief from stay.

### d. Unfair Discrimination

FirstMerit next argues that the proposed plan by the Chardon Debtors violates the "no unfair discrimination" requirement for cramdown under Section 1129(b)(1) by proposing to pay FirstMerit and Colfin interest on their claims at 4.00% while paying Old Second interest at 4.25%. However, like the argument concerning the inconsistencies between the Chardon Debtors' and Wolf Individuals' plans, this argument appears to be rendered moot by subsequent developments or can be fixed by a relatively simple amendment to the plans. First, the plans filed by the Wolf Individuals propose to pay interest to all three secured creditors at 4.25%. Further, as previously discussed, Donald Wolf Jr. testified that the Chardon Debtors' plan will be amended to become consistent with the Wolf brothers' plans. Second, also as discussed above, the Debtors have entered into settlement agreements with Colfin and Old Second whereby each can be paid by surrender of their collateral rather than through periodic payments through a plan. The Colfin and Old Second settlements necessitate amendment to the proposed plans. FirstMerit's reliance on the plans as filed without accounting for the Debtors' ability to amend the plan is misplaced. Accordingly, for purposes of this motion for stay relief, therefore, it has not been shown that unfair discrimination amongst the three creditors will render the debtors' plans unconfirmable.

### e. Releases

FirstMerit also argues that one or more of the proposed plans contain what it characterizes as improper releases of third party non-debtors, making the proposed plans unconfirmable. This argument, too, appears to be based on the plan filed by the Chardon Debtors before the Wolf Individuals filed their own bankruptcy cases. This argument has likely become moot by subsequent developments or can be fixed by a relatively simple amendment to the plans. It fails to present grounds for relief at this time and is best taken up at the hearing on plan confirmation.

The releases of liability against the Wolf Individuals seemed more problematic before the Wolf Individuals filed their own bankruptcies, because the original Chardon Debtors' plan seemed to effectively grant such individuals a bankruptcy discharge without the individuals having filed bankruptcy. Now, however, the Wolf Individuals have filed bankruptcies and can obtain discharges through their own Chapter 11 plans without needing to rely on a release in another's bankruptcy plan. Moreover, at least with respect to FirstMerit, both the Chardon Debtors' plan and the Wolf Individuals' plans propose to pay FirstMerit in full. Thus, if the plan is successful, the Wolf Individuals' liabilities will be satisfied when those claims are paid in full.

### f. Absolute Priority Rule

FirstMerit finally argues that either the Chardon Debtors' or the Wolf Individuals' plans violate the "absolute priority rule" and therefore cannot be confirmed without FirstMerit's consent. Under the "absolute priority rule" non-consenting unsecured creditors "in bankruptcy are entitled to full payment before equity investors can receive anything." *In re Castleton Plaza, LP*, 707 F.3d 821 (7th Cir. 2013) (citing 11 U.S.C. § 1129(b)(2)(B)(ii)). The proposed plans provide that equity holders in the Chardon Debtors will retain such interests, but FirstMerit's

argument is difficult to understand because each of the plans provides for payment of all allowed claims in full. FirstMerit contends that because the Wolf Individuals' cases were filed after the Chardon Debtors' cases, certain claims on joint debts owed to FirstMerit might be greater with respect to the Wolf Individuals than with respect to the Chardon Individuals because of interest or attorneys' fees that accrued during the gap between the two petition dates. According to FirstMerit, the Chardon Debtors cannot pay these 'postpetition as to Chardon' amounts through the Chardon Debtors' plan. But, even if the court were to assume *arguendo* such argument to be valid, FirstMerit does not explain why the Wolf Individuals would not be able to pay this amount through their *own* plan, either by extra contributions from their own assets or by extending the term of their own plan slightly longer than the plan for the Chardon Debtors.

It not being apparent that the Chardon Debtors' plan is inherently unconfirmable under Section 1129(b)(2)(B), the motion for stay relief will be denied, without prejudice to such issue being raised at a future hearing on confirmation.

## CONCLUSION

For the foregoing reasons, the Motions for Relief will be denied. Separate orders shall be entered giving effect to the determinations reached herein.

DATE: September 30, 2014                ENTER:

Thomas M. Lynch
United States Bankruptcy Judge