UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| In re Chardon, LLC, et al.[1] | ) | Bankruptcy No. 13-B-81372 |
| | ) | (Jointly Administered) |
| Debtors. | ) | Chapter 11 |
| | ) | Judge Lynch |

## MEMORANDUM OPINION

This matter comes before the court on the motions of debtors David Wolf, Donald Wolf, Jr. and Donald Wolf, Sr. for authority to use cash collateral of FirstMerit Bank, N.A. to pay certain professional fees.[2] For the reasons set forth herein, the motions are denied.

## JURISDICTION

The motions seek court authorization to use cash collateral pursuant to Section 11 U.S.C. § 363(c)(2)(B) and, therefore, the matter arises under title 11. Thus, the court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. These motions are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(M) in which this court has constitutional authority to enter final orders.

---

[1] Pursuant to the administrative order entered on July 2, 2014, the bankruptcy cases of Donald Wolf, Jr. (No. 13-B-83571), David Wolf (No. 13-B-83572) and Donald Wolf, Sr. (No. 14-B-81919) were procedurally consolidated for joint administration with the eight corporate bankruptcy cases previously procedurally consolidated for joint administration into the lead case of Chardon, LLC (13-B-81372).

[2] This memorandum decision relates to and resolves the motion for entry of an order authorizing the use of cash collateral of FirstMerit Bank, N.A. to pay professionals and approving the grant of adequate protection originally filed by David Wolf on May 6, 2014 in his individual bankruptcy case (No. 13-B-83572, ECF No. 130), a parallel motion originally filed by Donald Wolf, Jr. in his individual bankruptcy case on the same date (No. 13-B-83571, ECF No. 138), and a subsequent motion for additional use of cash collateral with respect to each of David Wolf's, Donald Wolf, Jr.'s and Donald Wolf, Sr.'s cases filed in the lead case on November 24, 2014 (No. 13-B-81372, ECF No. 1090).

## FINDINGS OF FACTS AND PROCEDURAL BACKGROUND

The following sets forth the court's findings of fact as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052.[3]

Individual chapter 11 debtors Donald Wolf, Jr. and David Wolf (the "Brothers") originally sought to pay their attorneys $137,035.89 and to pay their financial advisor $19,669.55 for post-petition services using funds derived from the rental income of 10611—10685 Wolf Dr., Huntley, Illinois (the "Huntley Building"). While the initial request was still pending, on November 24, 2014, the Brothers filed a second request, together with a request by their father Donald Wolf, Sr. (together with the Brothers, the "Wolfs"), who is represented by the same counsel, asking to pay an additional $115,277.50 to their attorneys and to pay a real estate appraiser, Edward Kling $6,600.00 also from the proceeds of rental income from the Huntley Building.

The Huntley Building is a commercial property held in a land trust. Donald Wolf, Sr., holds a 51% beneficial interest in this land trust. Brothers David and Donald, Jr. each hold a 24.5% beneficial interest. As of the Brothers' petition date, October 21, 2013, the three family members jointly and severally owed FirstMerit National Bank at least $15,153,147.72 on direct loans and guaranties of corporate debt.[4] This debt, which has been cross-collateralized, is secured by a pre-petition mortgage and assignment of rents in the Huntley Building and by a collateral assignment of the Wolfs' beneficial interest in the land trust. (Mem. Op., Case No 13-

---

[3] To the extent that any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

[4] Donald Wolf, Sr. filed his voluntary petition under Chapter 11 on October 28, 2013, originally in the Middle District of Florida. His case was transferred to the Northern District of Illinois on June 18, 2014, and has been jointly administered with the Brothers' cases and the Chardon corporate cases since July 2, 2014. No facts have been alleged to demonstrate that for purposes of these motions there was any material difference in the loan balances or value of collateral securing such loans in the week between the two petition dates.

B-81372 (Chardon), ECF No. 954, 9/30/2014.) It is undisputed that the loan balance exceeds the value of the Huntley Building.[5] It is also undisputed that the market value of the Huntley Building at this time is stable and likely will increase over the long-term. (*Id.*)

The professional fees sought to be funded, totaling $278,582.90, were approved by this court in mid and late-2014.[6] The orders approving these fees expressly prohibited payment from the cash collateral of FirstMerit without the court's further approval. The Wolfs allege that as of May 6, 2014, the date their initial motions were filed, they held $198,306.04 and as of November 24, 2014, the date of the second motion, they held $326,254.73 in cash collateral attributable to rents from the Huntley Building. They further allege that the current leases on that property generate approximately $52,461.21 in monthly rental income.

The Wolfs argue that FirstMerit is adequately protected even if $278,582.90 of its cash collateral is paid to the professionals because the real estate collateral is not diminishing in value and the cash collateral used to pay the fees will be replenished with future rents in which the Wolfs will grant FirstMerit replacement liens. FirstMerit opposes the motion on the grounds that it already has valid liens in the future rents and, therefore, the net value of its collateral interest will diminish if its cash collateral is paid to professionals as proposed.

---

[5] While the debt is also secured by certain other real estate, including real estate owned by the corporate debtors, it has not been demonstrated that the debt is less than the value of the even the entire collateral package.

[6] See Case No. 13-B-83571 (Donald Wolf, Jr.), ECF No. 203, 6/16/2014, approving attorneys' fees of $65,430.00 and expenses of $2,159.21; Case No. 13-B-83571, ECF No. 206, 7/7/2014, approving Mr. Javorek's fees of $9,834.78; Case No. 13-B-83572 (David Wolf), ECF No. 168, 6/16/2014, approving attorneys' fees of $67,317.50 and expenses of $2,129.18; Case No. 13-B-83572, ECF No. 196, 7/7/2014, approving Mr. Javorek's fees of $9,834.77; Case No 13-B-81372 (Chardon), ECF No. 1070, 11/21/2014, approving additional attorneys' fees of $43,845.00 and expenses of $28.75 for the Donald Wolf, Jr. case, additional attorneys' fees of $42,395.00 and expenses of $28.75 for the David Wolf case, and attorneys' fees of $28,800 and expenses of $180.00 for the Donald Wolf, Sr. case; Case No. 13-B-83571 (Donald Wolf, Jr.), ECF No. 181, 6/18/2014, approving Edward King and Real Valuation Group, LLC's fees of $3,300.00; and Case No. 13-B-83572 (David Wolf, Jr.), ECF No. 173, 6/18/2014, approving Edward King and Real Valuation Group, LLC's fees of $3,300.00.

## CONCLUSIONS OF LAW

A. Restrictions on the Use of Cash Collateral

A debtor-in-possession may not use "cash collateral" in which a creditor has an interest unless either the creditor consents or the court authorizes the use in accordance with Section 363. 11 U.S.C. § 363(c)(2). "Cash collateral" includes cash, deposit accounts and other cash equivalents whenever acquired in which both the debtor's estate and a creditor or other entity have an interest, and includes proceeds, products, offspring, rents, or profits of property in which a creditor has a security interest as provided in Section 552(b), whether existing pre-petition or post-petition. 11 U.S.C. § 363(a). A court may only authorize the use of cash collateral over the secured creditor's objection if the court finds that the secured creditor's interest is adequately protected. 11 U.S.C. § 363(e); *In re Heritage Highgate, Inc.*, 679 F.3d 132, 136 n.1 (3rd Cir. 2012).

The "interest in property" protected by Section 361 does not include a secured creditor's right to immediate foreclosure. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). Therefore, adequate protection does not require the creditor to be reimbursed simply because the creditor is deprived of possession as long as the collateral is not diminishing in value. *Id.*

Here, there is no evidence that the underlying real estate in which FirstMerit has a security interest is diminishing in value. However, if cash collateral is used to pay professional fees for services which have already been provided, the total amount and value of cash collateral held by the estate will decrease. The cash spent on the fees then will no longer be within the estate and the estate will not receive any proceeds in return. This is part of the reason that cash collateral receives the special protection afforded it by the Bankruptcy Code. As explained by

one court, Section 363(c)(2) provides this special treatment because cash collateral "is most likely to be consumed during the reorganization process and is at times subject to change on an almost daily basis." *Marathon Petroleum Co., LLC v. Cohen (In re Delco Oil)*, 599 F.3d 1255, 1258 (11th Cir. 2010). *See also In re EES Lambert Assocs.*, 62 B.R. 328, 343 (Bankr. N.D. Ill. 1986).

Where a secured creditor's debt is oversecured, the debtor-in-possession can generally spend cash collateral to the extent of the oversecurity without offering additional adequate protection because the creditor is protected by the remaining 'equity cushion.' *In re James Wilson Assocs.*, 965 F.2d 160, 171 (7th Cir. 1992) ("There is no unconstitutional taking of a security interest that is far in excess of the claim secured by it, if, after the taking, the creditor remains adequately protected, here by another security interest (the first mortgage)."). *See also, e.g., Price v. Del. State Police Fed. Credit Union (In re Price)*, 370 F.3d 362, 377 (3rd Cir. 2004) ("[I]n determining whether a secured creditor's interest is adequately protected, most courts engage in an analysis of the property's 'equity cushion.'") (citation omitted). But the only evidence presented here reveals that FirstMerit's claim is undersecured. That being the case, the movants must demonstrate that the secured creditor is adequately protected. *See* 11 U.S.C. §363(p).

B. <u>Adequate Protection</u>

    i. *<u>Protection Through Cash Payments</u>*

Where a creditor is not already protected by an equity cushion, an interest in collateral may be adequately protected by cash payments to the creditor to the extent use of the property decreases the value of the creditor's interest in the collateral. 11 U.S.C. § 361(1). But payments to a creditor out of that creditor's cash collateral will seldom protect a creditor from the

Page 5 of 18

dissipation caused by spending other portions of that cash collateral. While the creditor's claim may decrease by the amount of the payment received, the value of the cash collateral will decrease by an equal amount if the payment is made using the creditor's own collateral.

Because it is undisputed that FirstMerit's claim is undersecured, additional payments to FirstMerit from the creditor's own collateral will not protect it from loss caused by the payment of professionals' fees out of that collateral. As discussed below, the Wolfs have offered only to make payments out of FirstMerit's own collateral and have not proposed use of a source of funds that is not subject to a FirstMerit security interest.

### ii. *Protection through Replacement Liens*

Adequate protection can also be provided by granting a replacement lien in other unencumbered property. 11 U.S.C. § 361(2). The Wolfs offer a lien in future rents from the Huntley Building, but as discussed below FirstMerit already has a lien in those future rents. The Wolfs identify no collateral for use here other than property subject to FirstMerit's lien. Nor do they propose using the requested cash collateral to purchase property in which a new lien could be offered. Instead here the Wolfs are seeking to use the FirstMerit cash collateral to pay professionals for services already provided. The requested collateral will not be invested or used to increase the value of property subject to FirstMerit's existing lien.

Further, the Wolfs have not demonstrated that the payment of the professional fees may be charged as administrative expenses necessary to protect FirstMerit's collateral interest. Section 506(c) allows debtors-in-possession to recover from property securing an allowed secured claim "the reasonable, necessary costs and expenses of preserving, or disposing of, such property *to the extent of any benefit to the holder of such claim*." 11 U.S.C. § 506(c) (emphasis added). "[A]bsent an agreement to the contrary, a secured creditor's collateral may only be

charged for administrative expenses, including attorney's fees, to the extent these expenses directly benefited that secured creditor." *In re Blackwood Assocs., L.P.*, 153 F.3d 61, 68 (2nd Cir. 1998).

The Wolfs have not shown that the services provided by their counsel, financial advisor and appraiser will protect or enhance FirstMerit's collateral. Indeed, it is noteworthy that in contrast to the professional fees for general administrative expenses of the bankruptcy estate, FirstMerit has already consented and agreed to the use of its cash collateral for other expenses it acknowledges are necessary to maintain the real estate collateral and to collect future rents, such as utility expenses, property repair and upkeep, insurance, property taxes and property management fees.[7] As noted in *Blackwood*, the fact that services benefit the estate or reorganization generally or are allowed as administrative expenses is not sufficient to justify charging the expense of such services against a secured creditor's collateral.[8] *Id.* "Saddling unconsenting secured creditors with professional fees ... would discourage those creditors from supporting debtors' reorganization efforts." *Id.*

C. Existing Security Interest in Post-Petition Rents

There is no dispute here that FirstMerit holds a valid security interest in post-petition rents derived from the Huntley Building. The Brothers acknowledge in their motions that "FirstMerit holds a security interest in [10611 Wolf Dr.] and the rental income as cash collateral derived therefrom." (Mot., Case No. 13-B-83571 (Donald Wolf, Jr.), ECF No. 138, 5/6/2014, ¶14; Mot., Case No. 13-B-83571 (David Wolf), ECF No. 130, 5/6/2014, ¶14.) It is further undisputed that FirstMerit holds a valid pre-petition mortgage and assignment of rents in the

---

[7] See, e.g., 9th Interim Order Authorizing Use of Cash Collateral, Case No 13-B-81372 (Chardon), ECF No. 1040, 10/31/2014.
[8] To the contrary, the Bankruptcy Code generally elevates the rights of secured creditors over the rights of bankruptcy professionals by granting "super priority" to claims of secured creditors where 'adequate protection' later turns out to be insufficient. 11 U.S.C. § 507(b).

Huntley Building and a collateral assignment of the Wolfs' beneficial interest in the land trust holding the real property. (Joint Stipulation, Case No. 13-B-83571 (Donald Wolf, Jr.), ECF No. 77, 2/24/2014; Joint Stipulation, Case No. 13-B-83572 (David Wolf), ECF No. 70, 2/24/2014.)

The Bankruptcy Code generally cuts off pre-petition security interests in property acquired post-petition, even if a security agreement would validly extend to after-acquired property under state law. 11 U.S.C. § 552(a). But, Section 552(b) creates an exception to this rule, reviving such pre-petition security interests in certain post-petition property such as proceeds, products, offspring, profits <u>and rents</u> of pre-petition collateral in which a secured creditor had an interest. Specifically with respect to rents, Section 552(b)(2) provides:

> if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such ... then such security interest extends to such rents ... acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. §552(b)(2). As discussed earlier, cash payment out of FirstMerit's cash collateral or replacement liens on FirstMerit's collateral would not offer adequate protection.

Nor have the Wolfs demonstrated that the "equities of the case" exception applies here. The Seventh Circuit has observed that the "equity exception is meant for the case where the trustee or debtor in possession uses other assets of the bankrupt estate (assets that would otherwise go to the general creditors) to increase the value of the collateral." *J. Catton Farms, Inc. v. First Nat'l Bank of Chicago*, 779 F.2d 1242, 1247 (7th Cir. 1985). The Wolfs, however, have not shown that the debtors-in-possession have used other assets of the estate to increase the value of FirstMerit's collateral.

Some suggestion may be found in the legislative history for the 1994 amendments to the

Bankruptcy Code[9] that the equity exception may also be used to protect other interests. The House Report on the Bankruptcy Reform Act of 1994 described the 'equities of the case' provision as:

> a critical limit ... designed, among other things, to prevent windfalls for secured creditors and to give the courts broad discretion to balance the protection of secured creditors, on the one hand, against the strong public policies favoring continuation of jobs, preservation of going concern values and rehabilitation of distressed debtors, generally.

HR Rep. 103-834, 103rd Cong., 2nd Sess. 27-29 (Oct. 4, 1994); 140 Cong. Rec. H10768 (Oct. 4, 1994). *See also In re Laurel Hill Paper Co.*, 393 B.R. 89, 92-93 (Bankr. M.D.N.C. 2008). But in this case the debtor-movants are individuals, having neither employees nor going concern value.

Further, the Wolfs fail to demonstrate that it is equitable to surcharge FirstMerit's security interest in post-petition rents to fund the fees of professionals who provided only general services in the bankruptcy case. To routinely subordinate Section 552(b) security interests to attorneys' fees and other priority claims effectively allows the equitable exception to swallow the rule. *See, e.g., Sprint Nextel Corp. v. U.S. Bank, N.A. (In re TerreStar Networks, Inc.)*, 457 B.R. 254, 271 (Bankr. S.D.N.Y. 2011) (noting that courts have "described the narrow contours of the equities of the case doctrine," though refusing to adopt bright-line rule espoused by creditor). Even a determination under Section 330 that the fees in question are "reasonable" and "for actual, necessary services" does not establish why such fees should be funded by FirstMerit's collateral as opposed to unencumbered assets of the estate or even the collateral of other creditors or interest holders. For a debtor to show that the policy favoring "rehabilitation of distressed debtors" outweighs the recognition of secured interests under Section 552(b), the

---

[9] These amendments included the new §552(b)(2) which set out the exception for post-petition rents as its own subsection.

debtor needs at the very minimum to demonstrate that rehabilitation will benefit the secured creditor, that the professional fees are necessary for the secured creditor to receive such benefit, and that there is not a more appropriate source to pay those fees. Indeed, the legislative history to Section 552(b) "indicates that 'equities of the case' includes the situation where application of a pre-petition security interest to post-petition rents would be unfair to unsecured creditors because expenditures would be required of the estate to preserve the secured creditor's collateral or improve its position." *In re Cardinal Indus., Inc.*, 118 B.R. 971, 981 (Bankr. S.D. Ohio 1990). In the present motions, however, the Wolfs make no such showing.

D. Debtors' Reliance on *Addison Properties* Is Misplaced.

The Debtors rely upon *In re Addison Properties Limited Partnership*, 185 B.R. 766 (Bankr. N.D. Ill. 1995), for the proposition that debtors may use post-petition rents constituting cash collateral for expenses such as attorneys' fees incurred between the petition and plan confirmation so long as the underlying property is not decreasing in value. *Addison* holds that for "purposes of adequate protection, the claim of the secured creditor is fixed as of the date of filing [and while] Section 552(b) proceeds increase the collateral securing that claim [they] do not increase the claim for purposes of adequate protection." 185 B.R. at 784. The opinion acknowledges that post-petition collateral should be considered for confirmation for purposes of treatment under the plan but holds that post-petition changes in value of collateral should not be considered for purposes of pre-confirmation adequate protection. 185 B.R. at 784. This is referred to as the "dual valuation approach."

*Addison* offers three main justifications for its approach: (1) that the Bankruptcy Code does not expressly specify the date for valuation for purposes of adequate protection and a number of cases have held that adequate protection is designed generally to protect the *status*

*quo* as of the petition date; (2) that where the value of collateral or proceeds of collateral fluctuates up and down, a 'continuous valuation approach' can have an unfair 'ratcheting effect,' and (3) a 'continuous valuation approach' can encourage wasteful continual re-evaluations of collateral during the pendency of the case. 185 B.R. at 779-84. For example, in the context of volatile stocks, the continual valuation may result in the creditor being treated as having a right to a claim secured by the highest market value of the stock during the period between the petition date and confirmation or the approach may encourage the creditor to bring a new motion demanding adequate protection every time the market price increases.

    i.    <u>The Rationale for the Continuous Valuation Approach Is Not Persuasive Here Where There Is Little Basis to Anticipate Fluctuations in the Pre-confirmation Value of Section 552(b) Collateral.</u>

*Addison* expressly attempts to address the circumstances surrounding and issues posed by fluctuating property values post-petition and pre-plan confirmation. Rental income that is received, however, is by its nature positive and not variable. *Addison's* "criticism of continuous valuation focuses on interests in property that fluctuates in value according to market forces rather than interests in rents that increase by accrual and do not decline." *Putnal v. SunTrust Bank*, 489 B.R. 285, 291 (M.D. Ga. 2013). In contrast, rent is typically paid in cash or cash equivalents which are readily quantifiable and predictable. There appears to be little realistic risk that an unfair 'ratcheting effect' will occur with respect to collateral rental income whereby a secured creditor would benefit from what proves to be only an interim 'paper' profit.

*Addison* suggests that the continuous valuation approach is problematic not only for companies with assets with fluctuating values but also for companies with fluctuating revenues, such as seasonal businesses. 185 B.R. at 781-82. For example, the decision considers the enterprise that in some months realizes "proceeds well in excess of *operating costs*, while in

other months, its proceeds are less than what is required to maintain operations." 185 B.R. at 781 (emphasis added). Use of the continuous valuation approach in such a case poses a "predicament," in the language of the opinion, because doing so forces the debtor to provide adequate protection when there is a cash shortfall, resulting in the secured creditor receiving "greater protection than it would have had, through foreclosure, in the absence of a bankruptcy." 185 B.R. at 782-83.

However, this reference to "operating costs" is misleading, at least in the context of collateral rental income, since post-petition revenues of an operating company are less likely to fall within the Section 552(b) exception to Section 552(a). Section 552(b)'s exception applies to rents, proceeds and certain other ancillary assets closely related to pre-petition collateral. The statute's exception does not generally apply to revenues for the post-petition sale of products or services unless they are traceable proceeds of pre-petition collateral. If a creditor were to foreclose upon or take possession of the assets of an operating company, it is not likely that such company would be able to continue to provide services or produce new products to generate new revenues. Therefore, for most operating companies such post-petition revenues, whether fluctuating or not, are not cash collateral and the debtor is not required to provide adequate protection for their use.

In contrast, if the debtor was in the leasing business, as is the case here, and the post-petition revenues were rents, notwithstanding *Addison's* suggestion to contrary it is apparent that the continuous valuation approach would not give the creditor "greater protection than … through foreclosure." If the creditor foreclosed on the real property and had an assignment of rents, the creditor would be entitled to collect the rents. Although even real estate may have certain "operating costs" in the form of necessary expenses to protect the real property or to

collect rents – expenses the creditor would have to pay if it foreclosed on the property to be able to continue to collect rents – such expenses can already be approved under the surcharge provision, Section 506(c), or under the "equities of the case" exception to Section 552(b). Therefore it is unclear why *Addison's* example of a business with fluctuating revenues justifies charging general administrative expenses against a secured creditor's interest in cash collateral protected under Section 552(b), whether it is a slow month or a busy month.

    ii.    <u>Adopting the Approach Taken by *Addison* to Post-Petition Rents Is Not Consistent with Section 552(b) and the Treatment Required by Sections 361 through 363.</u>

Application of *Addison's* dual valuation approach to rent is inconsistent with Section 552(b). Congress gave secured creditors protection of their cash collateral interests in Sections 363(c)(2), 363(e) and 361 of the Bankruptcy Code. Section 552(b) recognizes that secured creditors holding valid pre-petition assignments of rents have a security interests in post-petition rents. *In re Wheaton Oaks Office Partners Limited Partnership*, 27 F.3d 1234, 1245 (7th Cir. 1994). Because of Section 552(b)(2), post-petition rents are themselves cash collateral subject to adequate protection under Sections 361 and 363. *Federal Nat'l Mortgage Assoc. v. Dacon Bolingbrook Assocs. L.P.*, 153 B.R. 204, 211-12 (N.D. Ill. 1993). As emphasized by the district court: "the value of a secured creditor's interest in property plus the rents generated from that property is greater than a secured creditor's interest in the property alone." 153 B.R. at 211. Although it has not taken up the issue directly, the Seventh Circuit has indicated that a security interest in post-petition rents is a separate interest which must be protected:

> A determination that rents constitute cash collateral places several limits upon the trustee's use of those rents during the administration of the debtor's reorganization. Section 363(c)(2) provides that a trustee may not use cash collateral unless each creditor with an interest in the cash collateral consents, or the bankruptcy court, after notice and hearing, authorizes such use. Furthermore, § 363(c)(4) requires the trustee to keep cash collateral segregated from other property in the bankruptcy estate.

*In re Wheaton Oaks Office Partners Limited Partnership,* 27 F.3d 1234, 1240 (7th Cir. 1994). If the legislature intended to make post-petition rents freely available to debtors-in-possession it would not have enacted the exception to Section 552(a) found in Section 552(b)(2).

*Addison* questioned the holding in *Dacon*, stating that the district court did "not address the question of when to value the interest of the secured creditor that must be protected." 185 B.R. at 776 n. 10. Under *Addison*'s approach, the interest in <u>post</u>-petition rents to be protected under Section 363 and 361 will always be zero because the secured claim to be adequately protected must be valued as of the petition date. But it is not apparent that future rents under binding leases, as in the case here, are without value simply because they have not been collected. As an analogy, few would argue that an annuity is valueless simply because it is not payable until a future date. Even if a lease is an executory contract, a lessee is liable for breach of contract if the debtor assumes the lease and performs but the lessee fails to pay rent.

Second, the bifurcation provision in Section 506(a) that is central to *Addison's* reasoning limits an *allowed secured claim* to the value of the interest in the collateral securing that claim. But, Sections 363(c), (e) and 361 by their terms protect a creditor's "interest in property" sought to be used, not "allowed secured claims." See *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 328 (1993) (in rejecting a proffered interpretation of Section 1322(b)(2), noting that such provision provided for modification of "the rights of holders of secured claims" not modification of "claims"). Although the Supreme Court in *Timbers* held that the "interest in property" protected by Sections 361 through 363 "does not include a secured party's right to immediate foreclosure," nothing in the opinion suggests that a valid interest in post-petition rents under Section 552(b) deserves no protection. 484 U.S. at 371. To the contrary, in *Timbers* the debtor had already

agreed to pay post-petition rents to the creditor. 484 U.S. at 368. The issue was whether the creditor was entitled to *further compensation* for the delayed possession of the real property. *Timbers* identified the rights granted under Section 552(b) as a further reason why undersecured creditors are not entitled to post-petition interest. 484 U.S. at 374.

It is noteworthy, too, that the present case does not present the danger raised in *Addison* of a secured creditor seeking more than adequate protection of its interest and instead attempting to "fence off the entire collateral . . . so that no other creditor can get at it." 185 B.R. at 776, n.10 (quoting *In re James Wilson Assocs.*, 965 F.2d 160, 171 (7th Cir. 1992)).[10] Here, FirstMerit is not seeking to "fence off" the post-petition rents by demanding payment or possession of post-petition rents. Instead, the bank is seeking to prevent the Debtors from irretrievably dissipating the bank's cash collateral by paying it to the Wolfs' attorneys and other professionals for services already provided.

### iii. The Treatment of Section 552(b) Urged by the Wolfs Has Been Largely Disfavored by Other Courts.

A majority of recent cases appears to have rejected the Wolfs' argument that notwithstanding a creditor's valid security interest in rents under Section 552(b), an undersecured creditor's post-petition collateral rent can be used without providing adequate protection so long as the underlying real property is not depreciating in value. In *Putnal v. SunTrust Bank* a district court recently concluded from a review of the case law that "the weight of authority holds that a creditor's interest in rents is separate from its interest in the land and corresponds to the amount of rents that accrue" and most of the "courts addressing this issue have held that the value of this interest should be measured by the actual rents that have accrued

---

[10] In *James Wilson Assocs.*, the court permitted the debtor to use cash collateral to pay bankruptcy professionals where, unlike here, the creditor was oversecured and the rents sought to be used were less than the equity cushion protecting the creditor's security interest. 965 F.2d at 171.

or will accrue." 489 B.R. 285, 287 (M.D. Ga. 2013). Similarly, in *In re Union-Go Dairy Leasing, LLC*, the court held that a post-petition lien in rents was not adequate protection for the use of cash collateral to pay administrative expenses where the creditor already had a lien under Section 552(b) in those rents. 2010 WL 1848485 (Bankr. S.D. Ind. May 6, 2010) ("The Debtor simply cannot give AgStar a replacement lien in the Rents where AgStar's interest in such postpetition Rents was already fully secured by virtue of § 552(b) of the Bankruptcy Code.")[11].

A fair reading of Section 506(a) when taken together with Section 552(b) appears to require that the post-petition security interest in rents be considered. *In re Bloomingdale Partners*, 155 B.R. 961, 976 (Bankr. N.D. Ill. 1993). Similarly, in addressing the issue of how to apply adequate protection payments made from post-petition rents, most courts have recognized the separate and additional interest in the rents as collateral. These courts, adopting the so-called 'addition' approach have held that post-petition rents increase the amount of a claim treated as secured under Section 506(a) and therefore adequate protection payments made from post-petition rents subject to a valid assignment of rents should not be subtracted from the creditor's secured claim. *Civic Partners Sioux City, LLC*, No. 11-00829, 2013 WL 5534743 (Bankr. N.D. Iowa Oct. 7, 2013). *See also In re Lichtin/Wade, L.L.C.*, 486 B.R. 665, 678 (Bankr. E.D.N.C. 2013) (so-called addition cases "correctly recognize the existence of the § 522(b) security interest in post-petition rents and properly reduce the unsecured claim by the amount of the rent collateral held by the Debtor."); *In re Old Colony, LLC*, 476 B.R. 1, 27 (Bankr. D. Mass. 2012) (adopting addition approach as recognizing separate security interest in rents); *In re Lilo Properties, LLC*, No. 10-11303, 2011 WL 5509401 (Bankr. D. Vt. Nov. 4, 2011) (adopting addition approach as "better reasoned"). It is "the 'addition' approach [that] gives the "§ 552(b)

---

[11] The court also refused to apply the equities exception to § 552(b) noting that the debtor had no employees and was merely a pass-through entity. *Id.*

Page 16 of 18

creditor the benefit of its bargain, a fundamental goal behind plan confirmation and adequate protection payments." *In re Geijsel*, 480 B.R. 238, 267-68 (Bankr. N.D. Tex. 2012). In short, the clear trend of authority, one which this court finds persuasive, is that the post-petition rents shall be treated as additional collateral increasing the secured portion of the claim and decreasing the unsecured portion.

This is not even the extreme or inequitable case of a blanket lien-holder with a stranglehold on the debtor. The motions to use cash collateral were not brought in a single asset real estate case, but in the bankruptcy cases of three individuals. Earnings from post-petition services performed by the Wolfs are property of their respective estates under Section 1115(a)(2) but not subject to a security interest of FirstMerit or any other pre-petition creditor under Section 552(a).

While Congress has recognized that in some instances reorganization can result in net benefits to both creditors and equity holder where "the assets of the debtor would be more valuable if used in a rehabilitated business than if 'sold for scrap,'" *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 203 (1983), Congress also chose in Section 552(b)(2) and Section 363(c) to preserve the right of secured creditors to control the use of and have a valid security interest in post-petition rents rather than make such rents freely available for the administrative costs of reorganization. As opposed to revenues generated by post-petition labor or services, the categories protected by the exception in Section 552(b) are more likely be the same or of similar value in the hands of the secured creditor. Unlike the more abstract value of time or deprivation of assets that was generally noncompensable under the *Timbers* decision, creditors with a valid assignment of rents are deprived of real, concrete and nonspeculative value if deprived of post-

petition rents, which under state law they would be able to collect outside of bankruptcy. Each payment of rent made during the bankruptcy is likely a payment of rent that the creditor would have received if able to pursue the creditor's state law rights. It is allowing post-petition rents to be spent as proposed here that impermissibly alters the creditor's position.

## CONCLUSION

For the foregoing reasons, the Wolfs have not demonstrated that FirstMerit Bank, N.A.'s interest in cash collateral will be adequately protected if it is used to pay the professional fees of Barrick Switzer, Ronald Javorek or Edward Kling as proposed. Accordingly, the motions will be denied. Separate orders shall be entered giving effect to the determination reached herein.

DATE: January 12, 2015     ENTER:

Thomas M. Lynch
United States Bankruptcy Judge